**Miguel Angel PAREDES, Appellant,**

v.

**The STATE of Texas.**

**No. 74293.**

Court of Criminal Appeals of Texas.

Jan. 14, 2004.

Rehearing Denied April 7, 2004.

Julie B. Pollock, San Antonio, for Appellant.

Edward F. Shaughnessy, III, Asst. DA, San Antonio, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., join.

Appellant was convicted in October 2001 of capital murder. TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises twenty-nine points of error. We affirm.

Appellant was indicted for killing more than one person in the same criminal transaction. State's witnesses Eric Saenz (hereinafter "Eric") and Thomas Ayala both testified to statements made to them by co-defendant John Anthony Saenz

---

**1.** Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

(hereinafter "John") implicating appellant in the murders. Appellant's defense was that he was merely present after the murders, but did not participate in the murders. In his first eleven points of error, appellant objects to Eric's and Ayala's testimony.

In points of error one, three, five, and seven, appellant claims that the trial court erred in allowing Eric's testimony about statements made by John as: a statement against interest under Rule 803(24), as a statement of his then-existing state of mind under Rule 803(3), as a statement by a co-conspirator under Rule 801(e)(2)(E), or as an adopted admission by a party-opponent under Rule 801(e)(2)(B).

At trial, the State called Eric as a witness. Eric testified that he had learned that his brother, John, was having problems with an individual named Adrian Torres. Eric testified that John owed Torres money for drugs. On the morning of September 17, 2000, Eric received a phone call from John. John told Eric that Torres was coming over to his house, and he asked Eric to come over and bring a weapon because he was expecting trouble. Eric told John that he could not come because there was no one available to stay with his children. John told Eric he would recruit some other friends to come over, including appellant. Eric testified that he, John, and appellant were all members of the

Pistoleros gang, also called the HPL, and he had previously met appellant at a gang meeting. John called Eric again later and told him that appellant and Gregorio Alvarado were there and had guns. Alvarado was also a gang member. John called Eric again after 1:00 p.m. and said that "they had taken care of what was going to happen, that the murder[s] had already happened and that he wanted [Eric] to go over and help dispose of the bodies." Eric asked John why he would need more than the people who were already there to help. Eric also testified that he knew from what John had told him that there were three bodies to dispose of—Torres, Torres' girlfriend, and a third person. Eric did not go to John's house, but later that night John, appellant, and someone named Thomas arrived at Eric's house. They all got out of the van and began telling Eric what had happened.

Appellant had not asserted any hearsay objections up to this point. When the State asked Eric to repeat what John told him, appellant objected:

[Prosecutor]: I want you to tell the jury to the best of your recollection what it was John told you.

[Defense attorney]: Excuse me. Your Honor, we're going to renew our previous objection to the hearsay statements of John Anthony.[2]

---

**2.** In a pretrial hearing, the State raised the issue of the admissibility of a written statement by Eric which the State anticipated would be controverted. Appellant objected to portions of Eric's statement as hearsay. Appellant also claimed that admission of the statement would violate his right to confrontation. The trial court ruled the statement admissible under several different theories relating to different portions of the statement, including statement against interest, statement of then existing state of mind, admission of a party opponent, and adoptive admission. Only the admissibility of Eric's written statement was discussed at the hearing. The State

also raised the issue of a written statement by Thomas Ayala, discussed later in this opinion.

Although the parties discussed the admissibility of the written statements, and the trial court ruled certain portions of the statements admissible under various theories, the trial court also granted, on the same day, appellant's "Motion to Prohibit the State from Attempting to Introduce Written Statements or Reports of State's Witnesses." This order at least suggests that the written statements discussed in the hearing were not to be introduced at trial.

THE COURT: That's overruled.

Eric then testified to the details of the murders as described by John, stating that John told him that he shot Torres, that appellant shot Torres' girlfriend, Nelly, and that Alvarado also shot Nelly and the third victim, "Shawn." Eric described what John told him about cleaning up and disposing of the bodies. Eric affirmed that appellant stood by as John told Eric the details about what had happened. Appellant's only comment to John's description of the events was that Eric "should have been there, [he] would have had some fun." Eric described appellant's demeanor during this time as unfazed by what had happened. He also testified on re-direct that after John described the events of the night, appellant told Eric that they were going to start "going hard with the Mexican Mafia," that "[t]hey were going to start taking them out." Evidence indicated that Torres was a member of the Mexican Mafia.

Appellant complains in his brief about three portions of Eric's testimony that he maintains are inadmissible hearsay: (1) Eric's testimony about the telephone conversations with John before the murders; (2) Eric's testimony about the telephone conversations with John after the murders; and, (3) Eric's testimony about the face-to-face conversation with John after the murders. We will address only the third category because that is the only category to which appellant objected at trial. Tex. R.App. P. 33.1.

Rule of Evidence 801(e) identifies circumstances in which certain statements are not hearsay. A statement offered against a party which is "a statement of which the party has manifested an adoption or belief in its truth" is not hearsay. Tex.R. Evid. 801(e)(2)(B).

■ Eric recounted statements that were made in appellant's presence. When appellant stood by and listened to John's description of the murders and the surrounding events without disputing them, pointing out that Eric "should have been there" because he "would have had some fun," he manifested his agreement with the statements. Thus, the complained-of testimony was admissible as an adoptive admission and was not hearsay. *See Cantu v. State*, 939 S.W.2d 627, 634–35 (Tex.Crim.App.1997)(statements made by co-conspirators in defendant's presence were admissible as adoptive admissions where defendant, by his actions and responses, showed agreement with the statements).

Appellant argues that because John was "the boss" and was such an intimidating figure in the gang, none of the other gang members would reasonably have felt free to contradict anything he said. Under these circumstances, appellant argues, his silence cannot be viewed as an adoptive admission. Appellant cross-examined Eric about this theory, and Eric testified that John was "one of" the leaders in the gang but that there was another gang member above him. He did, however, state that when John told you to do something, you did it. On re-direct, Eric testified that the gang member over John gave the orders. Moreover, the evidence reflects that Eric was not so intimidated that he did whatev-

---

The trial court's ruling at the pretrial hearing on the admissibility of the written statements did not excuse appellant from objecting to trial testimony by the same witnesses. Tex. R.App. Proc. 33.1. A written statement is different evidence altogether from trial testimony. Appellant objected only once to Eric's testimony, with a reference to appellant's "previous objection to the hearsay statements of John Anthony." We will assume that by this reference, appellant was attempting to apply to this portion of the trial testimony all of his previous hearsay objections made to the written statement at the pretrial hearing.

er John asked him to do. For example, twice when John sought help from Eric on the night of the offense, Eric told him no. Plus, it is significant that appellant was not simply silent in light of John's narrative of the events. He expressly indicated his agreement with what John said by telling Eric that he "should have been there" and that he "would have had some fun." And he reaffirmed the killings by stating that there would be more dead members of the Mexican Mafia.

The trial court acted within the zone of reasonable disagreement in allowing the testimony as an adoptive admission under Rule 801(e)(2)(B). Accordingly, we need not address appellant's arguments concerning admissions of the statements under other hearsay exceptions. Points of error one, three, five, and seven are overruled.

■ Appellant claims in points of error two, four, six, and eight, that admission of Eric's aforementioned testimony about statements made by John violated appellant's right to confront witnesses against him under the Sixth Amendment to the United States Constitution. Although appellant objected at the pretrial hearing to the admission of Eric's written statement on Confrontation Clause grounds, he did not assert that objection to Eric's testimony at trial. His trial objection referenced only previous "hearsay" objections. Appellant failed to preserve error on Confrontation Clause grounds at trial. TEX. R.APP. PROC. 33.1. Points of error two, four, six, and eight are overruled.

In points of error nine and eleven, appellant claims that testimony by Thomas Ayala as to statements made by John was hearsay and not admissible as either state-

ments against interest or adoptive admissions by a party-opponent.

■ Ayala testified at trial for the State, describing his participation in disposing of the victims' bodies after the murders.[3] Appellant asserted a hearsay objection when Ayala was asked to describe a conversation he had with John in which John told Ayala about the murders. The trial court overruled the objection. Ayala testified that John told him that he shot one of the male victims in the neck, that appellant shot a male victim and a female victim, and that Alvarado shot and stabbed one of the male victims. Although appellant was present and listening to John's retelling of what happened, he did not interrupt or object to John's version of the story. Ayala testified that when they later went to Eric's house, John again described the events to Eric in appellant's presence, and again appellant did not comment.

For the reasons stated in connection with points of error one, three, five, and seven, we conclude that the trial court did not abuse its discretion in admitting the statements as adoptive admissions by a party opponent. Again appellant argues that because John was such an intimidating figure in the gang, no one would have felt free to contradict anything he said. However, other evidence previously admitted suggested that appellant did not simply remain silent in the face of John's version of events, but verbally articulated his agreement. Eric testified that after listening to John's version, appellant told him that he "should have been there" and that he "would have had some fun." And appellant warned that there would be more deaths among members of the Mexi-

---

**3.** During the same pretrial hearing in which the admissibility of Eric's written statement was discussed, the State raised the issue of admissibility of portions of a written state-ment by Ayala. Only the admissibility of Ayala's written statement was debated at the hearing.

can Mafia. In light of the context of the statements, the trial court did not abuse its discretion in concluding that they were admissible as adoptive admissions. Moreover, whether or not appellant would have been afraid to disagree with John's narrative is a factor that bears on the credibility and weight of the statement, not its admissibility as an adoptive admission. *Tucker v. State,* 771 S.W.2d 523, 535–536 n. 5 (Tex.Crim.App.1988). By his silence and later embellishments, appellant indicated his adoption of the statements. Because we hold the statements admissible as adoptive admissions, we need not address appellant's claim that the statements were not admissible as statements against interest. Points of error nine and eleven are overruled.

█ In points of error ten and twelve, appellant claims that Ayala's testimony violated the Confrontation Clause. Appellant did not assert an objection based on the Confrontation Clause at trial. At the pretrial hearing, the trial court ruled on the admissibility of Ayala's written statement. The trial court's pretrial ruling as to the *written* statement did not excuse appellant from objecting to Ayala's *trial testimony.* The constitutional issue was not preserved. TEX.R.APP. PROC. 33.1. Points of error ten and twelve are overruled.

In points of error thirteen through eighteen, appellant claims that the trial court erred in denying his requests for jury instructions that Ayala, Priscilla Saenz (hereinafter, "Priscilla"), and Julio Gonzalez were accomplices as a matter of law or

as a matter of fact. In point of error nineteen, appellant claims that the trial court erred in denying his request for a jury instruction that John was an accomplice as a matter of law.

█ An accomplice participates with a defendant before, during, or after the commission of a crime and acts with the required culpable mental state.[4] *Kutzner v. State,* 994 S.W.2d 180, 187 (Tex.Crim.App.1999)(citing *McFarland v. State,* 928 S.W.2d 482, 514 (Tex.Crim.App. 1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997)). The participation must involve an affirmative act that promoted the commission of the offense with which the accused is charged. *Id.* An accomplice as a matter of law is one who is susceptible to prosecution for the offense with which the accused is charged or a lesser included offense. *Id.; Blake v. State,* 971 S.W.2d 451, 455 (Tex.Crim.App. 1998). The trial court is under no duty to instruct the jury unless there exists no doubt or the evidence clearly shows that a witness is an accomplice witness as a matter of law. *Id.* If the evidence presented by the parties is conflicting and it is not clear whether the witness is an accomplice, then the trial court must leave to the jury the question of whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term "accomplice." *Blake,* 971 S.W.2d at 455. We will address the status of each witness separately.

### Ayala

█ Ayala testified that he received a phone call from John on the evening of

---

4. *See* Section 7.02(a) of the Texas Penal Code regarding criminal responsibility for conduct of another:

(a) A person is criminally responsible for an offense committed by the conduct of another if:

(1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; ...

September 17, 2000, in which John asked him to come over to his house "as a favor." Ayala stated that he knew John as a friend, but that Ayala was not a gang member. When he arrived at John's house, Ayala saw appellant, John, and Alvarado standing in the garage. John told Ayala that they "had to take care of some business" and showed him some rugs rolled up in the back of a pick-up truck parked in the garage. Ayala realized a few minutes later that the rugs contained bodies. Ayala was asked to help jump-start the truck loaded with the bodies, and after that, appellant and Ayala went to get some gas. When they returned to John's house, John said they were going to dispose of the bodies. Ayala was instructed to go first in his van. John and someone named Rex rode with Ayala. The truck with the bodies was next, followed by a third vehicle. They left the city and drove about two hours. John gave directions. The drivers of the three vehicles pulled off on a dirt road. The bodies were removed from the truck and Ayala saw flames. Ayala never got out of the van. When they got back to San Antonio, they washed out all three vehicles. Then they all went to Eric's house. Ayala testified that John described the murders to him during the drive and repeated the story at Eric's house. Appellant's requests for a charge that Ayala was an accomplice as a matter of law or a matter of fact were denied.

Appellant was charged with the murder of more than one person in the same criminal transaction. When Ayala arrived at John's house, the multiple murders had been committed. There is no evidence that the victims were still alive at that point or that Ayala was in any way involved in the planning of the murders. Ayala was not susceptible to prosecution for capital murder or a lesser included offense. Although Ayala assisted after the fact in the disposal of the bodies, he is not an accomplice as a matter of law because he is not susceptible to prosecution for capital murder. The trial court was under no duty to leave the question of Ayala's participation as an accomplice as a matter of fact to the jury because there is no conflicting evidence or doubt on the question of his complicity in the murders.

### Priscilla Saenz

■ Priscilla was married to John. Priscilla testified that in early September 2000, she learned that Adrian Torres had given John $800 worth of cocaine. In the days prior to the murders, Torres phoned John's house several times seeking payment for or return of the drugs. On September 17, 2000, John told Priscilla that she needed to leave because Torres was coming over and he was "going to take care of business." Appellant and Alvarado were also there. Priscilla left the house around 11 a.m. When she returned home at 6 p.m., the "whole house was torn apart." John, appellant, Alvarado, and several others were there. John told her he was remodeling the house. Priscilla asked him where his truck was, and he told her it was in the garage. Priscilla saw the carpets in the back of the truck and learned that they contained the bodies of Torres and two others. Priscilla later went to the store at John's request and purchased some gas and cigarettes. After she returned, John and the others left with the bodies. Appellant's requests for a charge that Priscilla was an accomplice as a matter of law or a matter of fact were denied.

For the same reasons that Ayala was not an accomplice as a matter of law or fact, neither was Priscilla. Priscilla arrived home after the murders had been committed. There is no evidence that Priscilla was in any way involved in the planning of the murders. Although she

may have suspected that foul play would occur when Torres arrived at her house, there is no evidence suggesting that she assisted in the preparation for or planning of the murders. Priscilla was not susceptible to prosecution for capital murder or a lesser included offense. There is no conflicting evidence or doubt on the question of Priscilla's complicity in the murders. The trial court did not abuse its discretion in denying appellant's requests for accomplice witness instructions.

### Julio Gonzalez

■ Julio Gonzalez testified that he was a member of the HPL gang. He stated that John was the leader at the time of the offense and that appellant was his "right-hand man." Gonzalez was summoned to John's house at around noon on the day of the offense to work on "construction" such as painting and putting down tile. Gonzalez and two others, Jaime Acevedo and Jason Villarreal, were driven to John's in a car sent for them by John. When they arrived, John, appellant, and Alvarado were there. The carpet in the house had been cut and rolled up and John told Gonzalez to look inside the carpet. When he unrolled the carpet, Gonzalez observed the bloody bodies of three people. John instructed Gonzalez and his two associates to put the bodies in the truck and they complied. They all spent the remainder of the afternoon drinking and cleaning up the blood in the house. At nightfall, Gonzalez drove the truck containing the bodies out into the country, following a van in which John was riding. Appellant and Acevedo or Villarreal followed the truck. When the three vehicles pulled off the road, Gonzalez stayed in the truck and observed some of the others set fire to the bodies. They returned to town and Gonzalez helped wash out the vehicles. Appellant's requests for a charge that Gonzalez was an accomplice as a matter of law or a matter of fact were denied.

For the same reasons Ayala and Priscilla were not accomplices as a matter of law or fact, neither was Gonzalez. Gonzalez could not have been charged with capital murder or a lesser included offense and there is nothing to support a theory that the evidence was conflicting on Gonzalez's complicity in the murders.

### John

John did not testify at trial. Appellant requested and was denied an instruction that he was an accomplice as a matter of law or, in the alternative, as a matter of fact. Appellant concedes the existence of controlling authority holding that an accomplice witness instruction is applicable only to accomplices who are witnesses, but urges the Court to reconsider such authority. *See Bingham v. State,* 913 S.W.2d 208 (Tex.Crim.App.1995)(op. on reh'g). He wants this Court to adopt the plurality opinion on original submission in *Bingham,* which held that the court of appeals did not err by interpreting Article 38.14 to require corroboration of a hearsay statement of a non-testifying accomplice before the statement could be considered by the jury in its deliberations at the guilt or innocence phase. *Id.* at 209. This appellant has presented no persuasive reasons for us to revisit this issue.

### Penal Code § 7.02(b)

■ The trial court's instructions included an instruction on the law of conspiracy under Penal Code § 7.02(b). Appellant argues that Ayala, Gonzalez, and Priscilla were accomplices under the meaning of Section 7.02(b) and therefore, he was entitled to the charge on accomplice witnesses. Section 7.02(b) provides:

If, in the attempt to carry out a conspiracy to commit one felony, another felony

is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Appellant does not explain how this section would apply to Ayala, Priscilla, and Gonzalez. To be applicable, there would still need to be evidence that Ayala, Priscilla, and Gonzalez were conspirators in carrying out one felony when another was committed. There is no evidence that the three conspired or attempted to carry out the murders. Points of error thirteen through nineteen are overruled.

In points of error twenty through twenty-six, appellant complains of the admission of allegedly inflammatory photographs of the three victims. Appellant claims that State's Exhibits 36A, 37A, and 38A were irrelevant and offered solely to inflame the minds of the jury. He concedes that State's Exhibits 143, 144, 145, and 146 were relevant but argues that their prejudicial effect outweighed their probative value.

Medical Examiner Dr. Jan Garavaglia testified at the guilt or innocence phase. He testified to the general condition of Torres' charred body and his various wounds. After describing Torres' fatal gunshot wounds, the State offered State's Exhibit 143, a color photo depicting the wounds. Appellant objected that the photo showed nothing that was not already contained in the autopsy report and that it was offered solely to inflame the minds of the jury. His objections were overruled and the photo was admitted. Garavaglia testified that Torres' body was positively identified by his dental records. Garavaglia also agreed that particularly in the case of charred remains, where a visual identifi-

cation cannot be made, a photograph of the burned victim is taken and marked with the unique case number. The State then offered State's Exhibit 37A, a photograph of the burned face of Torres. Appellant objected to the admission of Exhibit 37A, arguing that the photo was not necessary for identification purposes and served no purpose except to inflame the minds of the jury. The photo was admitted.

Garavaglia identified a second victim as Shawn Cain and testified about various wounds and the condition of Cain's charred body. The State offered State's Exhibit 144, a photo of Cain's gunshot wound and State's Exhibit 36A, the identifying autopsy photo of Cain's face with his assigned case number. Appellant again objected that the photos added nothing to the evidence and were offered solely to inflame the jury. The photos were admitted.

Garavaglia identified the third victim as Nelly Bravo and testified to the condition of Bravo's charred body and various wounds. The State offered State's Exhibit 145, a photo depicting a gunshot wound to the head, and State's Exhibit 146, a photo depicting a gunshot wound to the chest. Appellant objected that the photos had no probative value and were offered merely for the purpose of inflaming the jury. The State also offered State's Exhibit 38A, the identification picture reflecting the assigned autopsy number. Appellant objected on the ground that the photo did not contribute to Bravo's identification and was offered for inflammatory purposes alone. The photos were admitted.

The admissibility of a photograph is within the sound discretion of the trial judge. *Williams v. State,* 958 S.W.2d 186, 195 (Tex.Crim.App.1997). A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible. *Id.* Exhibits 36A, 37A, and 38A were described and

referred to by Garavaglio as autopsy identification photos. The photos depicted the victim before autopsy and displayed the autopsy number assigned to that victim. A photo of the victim displaying the autopsy number ensures that the autopsy report will correspond to the photos of the correct victim. Thus, even though the victims' identifications were based on their dental records, the medical examiner's office still utilized photos for purposes of tying the victims to their assigned case number. For this reason, the autopsy identification photos were relevant. And, while the photos are indeed prejudicial, they depict the condition of the victims' bodies when recovered. The photos were not so prejudicial as to outweigh their probative value. Tex.R. Evid. 403. Similarly, Exhibits 143, 144, 145, and 146 merely depicted the gunshot wounds as they appeared on the charred bodies. Appellant argues that the victims were all dead at the time their bodies were burned and therefore photos of their charred remains were not necessary to prove a contested issue. Nonetheless, the photos are probative of the efforts taken to cover up the crime, which bears on the issue of guilt. Although the photographs are gruesome, they depict nothing more than the reality of the brutal crime committed:

> Appellant must realize that it is precisely the quality which we describe as "powerful" which gives rise to his arguments that the photographs are prejudicially inflammatory. But when the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence. A trial court does not err merely because it admits into evidence photographs which are gruesome.

*Sonnier v. State,* 913 S.W.2d 511, 519 (Tex. Crim.App.1995). The trial court did not abuse its discretion in allowing the photographs. Points of error twenty through twenty-six are overruled.

In his twenty-seventh point of error, appellant claims that the death-penalty statute is unconstitutional because it violates the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution. Appellant argues that the risk of executing innocent persons and the long delays in uncovering evidence of innocence, often only possible with the benefit of newly developed scientific techniques such as DNA testing, compels a conclusion that our death-penalty statute violates due process. Appellant refers to reports, case studies, and court cases documenting the exoneration of actually innocent death row inmates.

■■ While execution of an innocent person would violate due process, the risk that another person who may be innocent will be executed does not violate appellant's due process rights. Appellant does not claim that he is innocent, and therefore fails to demonstrate that *his* rights under the Due Process Clause have been violated by application of our death-penalty statute. *See Cantu,* 939 S.W.2d at 639 (challenge to constitutionality of Article 37.071 which did not state how operation of statute was unconstitutional as applied to defendant in his particular situation was without merit). Point of error twenty-seven is overruled.

■■ In point of error twenty-eight, appellant claims that allowing the jury to consider any evidence "the court deems relevant to sentence" under Article 37.071 violates the Due Process Clause and the Sixth Amendment to the United States Constitution. He specifically complains of evidence presented at the punishment phase of his trial regarding unadjudicated offenses to which he claims he was tenuously linked. In order for unadjudicated

offenses to be admissible in the punishment phase of a capital murder trial, the State must present evidence which links the defendant to the crime. *Allridge v. State,* 762 S.W.2d 146, 162 (Tex.Crim.App. 1988). Appellant claims that allowing such evidence does not withstand the heightened reliability and procedural safeguards required in capital cases.

 The admission of unadjudicated extraneous offenses at the punishment phase of a capital case does not violate due process. *See Cantu,* 939 S.W.2d at 648; *Harris v. State,* 827 S.W.2d 949, 961–62 (Tex.Crim.App.1992). As we have noted, "[p]lainly, such evidence cannot be relevant to sentence ... unless the State also presents evidence that, if believed, establishes that the defendant himself committed the extraneous misconduct." *Harris,* 827 S.W.2d at 961. The admission of such evidence does not violate the notion of heightened reliability in capital cases. Point of error twenty-eight is overruled.

In his twenty-ninth point of error, appellant claims that his Sixth Amendment right to a trial by jury was violated at the punishment phase of his trial by the return of a jury verdict that was not based upon a requirement that the State prove the absence of mitigating evidence beyond a reasonable doubt. Appellant relies on *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We have rejected the contention that *Apprendi* requires the State to bear the burden to prove beyond a reasonable doubt that the mitigation issue should be answered in the negative. *Resendiz v. State,* 112 S.W.3d 541, 550 (Tex.Crim.App.2003). Nor does *Ring* support appellant's argument. *Ring,* like *Apprendi,* refers to an increase in penalty *over the statutory maximum.* In Texas, the statutory maximum for a capital of-fense is death. The mitigation issue does not increase the statutory maximum. To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is *less* than the statutory maximum. Point of error twenty-nine is overruled.

The judgment of the trial court is affirmed.

WOMACK, J., concurred.